IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      CRIMINAL ACTION
                             :
         v.                  :
                             :
KEVIN HERON               :       NO. 06-674-01

<u>MEMORANDUM</u>

Dalzell, J.                                 December 19, 2007

On October 17, 2007, at the close of the Government's case-in-chief, defendant Kevin Heron moved for a judgment of acquittal in accordance with Fed. R. Crim. P. 29(a). Because this case presents close questions touching on exactly what evidence the Government must present in order to prove securities fraud, we chose to reserve judgment under Fed. R. Crim. P. 29(b).

Two days later, a jury of this Court convicted Heron of one count of conspiracy to commit securities fraud and three counts of securities fraud. Because we had reserved our ruling on Heron's motion, we ordered the parties to brief in detail the questions that motion raised. All briefs having now been received, we proceed to address the matter on the merits.

I.  **Factual Background**[1]

At all times relevant to this indictment, Kevin Heron was the General Counsel of Amkor Technology, a public company that is an outsourcer of semiconductor assembly and test services.  Heron also held the title of Chief Compliance Officer.  In that role, he monitored the company's insider trading policy[2] and pre-cleared trades for those employees and directors who were subject to that policy.  He also advised the company on other issues related to compliance with the securities laws, including helping to determine whether and when the company was obliged to make certain disclosures.

The Government charged that, during three periods in 2003 and 2004, Heron traded in Amkor securities while he had

---

[1] This section provides only a brief recitation of the facts and the indictment.  Rather than reviewing here the evidence presented at trial, we will consider the relevant facts in the context of each of the indictment's substantive counts.

[2] This policy prevented insiders from trading at times when, in the company's judgment, there was an increased risk that some insiders might have material, non-public information about the company.  Heron was responsible for advising the insiders who were subject to the company policy when they could trade in compliance with the policy.  Although one of the purposes of this policy was to avoid potential criminal or civil liability for insider trading, there is no reason to expect that the policy's terms are co-extensive with the prohibitions of Section 10(b) and Rule 10-b(5).

material, non-public information about the company.  More specifically, the Government charged that:

(1) Between October 15, 2003 and October 17, 2003, while Heron knew that Amkor would likely be releasing positive quarterly earnings on October 27, 2003, he purchased 4,000 shares of Amkor stock;

(2) Between April 1, 2004 and April 26, 2004, while Heron knew that Amkor would likely be releasing negative quarterly earnings on April 27, 2004, he sold 17,000 shares of Amkor stock and traded 140 Amkor option contracts; and

(3) Between May 20, 2004 and July 28, 2004, while Heron knew that Amkor's financial performance was poor and that Amkor was involved in negotiations with Unitive, Inc. for a joint business transaction that the investment community might not applaud, he sold 22,100 shares of Amkor stock and traded one hundred Amkor option contracts.

The Government also charged that Heron conspired with Stephen Sands, an employee of another publicly held company, Neoware, to "exchange[] information regarding their respective companies, including material, non-public information such as financial performance and pending corporate deals, that they

3

relied upon in making securities transactions in Amkor and

Neoware."  Indictment[3] at 5.

   After a five-day trial from October 15-19, 2007, a jury

of this Court, after less than three hours' deliberation,

convicted Heron of all four counts.

## II.   **Standard of Review**

   When a Court reserves its ruling on a Rule 29 motion,

"it must decide the motion on the basis of the evidence at the

time the ruling was reserved."  Fed. R. Crim. P. 29(b).  Heron

made his motion at the close of the Government's case and did not

renew it at the close of all the evidence.  We must, therefore,

consider only the evidence that had been presented as of the

conclusion of the Government's case.[4]  We review that evidence

---

   [3] Unless otherwise specified, all references are to the
Second Superseding Indictment, which was filed on August 23,
2007.

   [4] Heron contends that we may consider evidence that he
presented and cites United States v. Gasomiser Corp., 7 F.R.D.
712 (D. Del. 1948) in support of that proposition.  We note first
that this contention ignores the unambiguous text of Rule 29(b).
Further, in Gasomiser, the defendant's motion had been renewed at
the close of all the evidence.  Under those circumstances, the
Court reasoned, it could consider evidence the defendant had
presented because otherwise "there could be no sound reason for
making such a motion again at the close of all the evidence."
Id. at 720.  Here, Heron did not renew his motion at the close of
the evidence or within seven days of the verdict, see Fed. R.
Crim. P. 29(c)(1), and so we may not consider any evidence he
                                          (continued...)

"in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001) (citing Jackson v. Virginia, 443 U.S. 307 (1979)).  We therefore "draw all reasonable inferences in favor of the jury verdict."  United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996).  In doing so, we "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury."  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

    While we must make all reasonable inferences in favor of the Government, we must also hold the Government to its proof and ensure that a rational jury could have reached a guilty verdict on the basis of the available evidence.  In doing so, the question is whether the jury, making reasonable inferences from the evidence presented and correctly applying the law as it was

---

        [4](...continued)
presented after the close of the Government's case.  We may, of course, consider exhibits Heron introduced during the Government's case-in-chief and any facts adduced during cross-examination of the Government's witnesses.

given to them, could have found Heron guilty beyond a reasonable
doubt.

## III.  Heron's Rule 29 Motion

### A.  Materiality

Before we begin our analysis of the substantive counts,
we pause to consider the materiality standard.

We instructed the jury that "[i]nformation is material
if there is a substantial likelihood that the information would
have been viewed by a reasonable investor as important in
deciding whether to buy, sell, or hold securities."  In order for
a fact to be material, the finder of fact must find "a
substantial likelihood that, under all the circumstances, the
[information] would have assumed actual significance in the
deliberations of the reasonable shareholder" or that "disclosure
of the omitted fact would have been viewed by the reasonable
investor as having significantly altered the 'total mix' of
information made available."  TSC Indus., Inc. v. Northway, Inc.,
426 U.S. 438, 449 (1976).  This standard is applicable in actions
under Section 10(b) of the Securities Exchange Act of 1934 and
Rule 10b-5.  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).

In dealing with information that is indefinite, such as
ongoing negotiations, materiality "will depend at any given time

upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Id. at 238 (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968)). Thus, the materiality of particular information is not fixed, but fluctuates in relation both to its definiteness and its effect on the company's prospects as a whole.  Materiality must be considered as of the time of each trade.

Definiteness and reliability are always issues in determining materiality since a reasonable investor would base trading decisions only on information that was at least moderately definite and reliable.  Reasonable investors do not rely on rank speculation to decide when to trade.  Our Court of Appeals has identified seven factors to consider in determining the materiality of future projections:

> the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information.

Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1242 (3d Cir. 1993)

(quoting Flynn v. Bass Bros. Enters., 744 F.2d 978, 988 (3d Cir.

1984)).

As several witnesses testified, one way of measuring

materiality after the fact is the reaction of the market once

information becomes public.[5]  Our Court of Appeals has

incorporated this idea, often called the Market Impact Test, into

its jurisprudence: "In the context of an 'efficient' market,[6] the

concept of materiality translates into information that alters

the price of the firm's stock."  In re Burlington Coat Factory

Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997).  By extension,

then, information that has no impact on the price of the

underlying stock when disclosed is generally immaterial as a

matter of law.[7]  Id.

_____

[5] Obviously, this method is only useful for measuring
the materiality of information that actually becomes public.
Where the information changes substantially between the
questioned trade and the public announcement, or where
information never becomes public at all, we must rely on less
precise methods.

[6] Amkor is listed on NASDAQ and trades well over a
million shares a day.  Neither party contends, nor could they
with a straight face, that this does not constitute an efficient
market.

[7] It is, of course, not always possible to link
movement in the stock price to the release of particular pieces
of information.  In this Internet age, so much information is
(continued...)

For each count in this indictment, the Government bore the burden of establishing that the information exchanged and/or traded upon was material.  At this procedural posture, therefore, we review the record to determine whether, based on the evidence presented and making all reasonable inferences in favor of the Government, a rational jury could have found that the information was material beyond a reasonable doubt.

With this exposition of the concept of materiality, we now move on to examine the substantive counts on which the jury convicted Heron.

### B.   Count I - Conspiracy

Count I of the Second Superseding Indictment alleges that between July 1, 2003 and June 4, 2004 Heron and Stephen Sands conspired to commit securities fraud by "exchang[ing] information regarding their respective companies, including material, non-public information such as financial performance and pending corporate deals, that they relied upon in making

---

[7](...continued)
available to investors that no disclosure ever takes place in isolation.  Thus, it is at least conceivable that two material items of information, released more or less simultaneously, could cancel each other out and produce the appearance of immateriality.  Nevertheless, the Market Impact Test remains a useful touchstone for analyzing materiality.

securities transactions in Amkor and Neoware" in violation of 18 U.S.C. § 371.  Indictment at 5.

Conspiracy is "an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act, combined with intent to commit the underlying offense." United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986).  "To establish a conspiracy, the government must show: (1) a unity of purpose between two or more persons; (2) an intent to achieve a common goal; and (3) an agreement to work together." United States v. Helbling, 209 F.3d 226, 238 (3d Cir. 2000).[8]  Because direct evidence of such an agreement rarely exists, a conspiracy may be proven by indirect and circumstantial evidence. Brodie, 403 F.3d at 134.  Thus, "the existence of a conspiracy can be inferred 'from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding.'" Kapp, 781 F.2d at 1010

---

[8] The Government must also prove an overt act in furtherance of the conspiracy.  On this record, it is clear that, if there was a conspiracy, the e-mails between Sands and Heron, as well as some of their trades, would be acts in furtherance of it.  We therefore concentrate our analysis on the question of whether a conspiracy existed.

(quoting <u>United States v. Ellis</u>, 595 F.3d 154, 160 (3d Cir. 1979)).

The Government must also show that the alleged conspirator has "at least the degree of criminal intent necessary for the substantive offense itself." <u>United States v. Feola</u>, 420 U.S. 671, 686 (1975).  A criminal violation of Rule 10b-5 requires the Government to prove that the defendant acted willfully and with an intent to defraud or deceive.  <u>See</u> <u>United States v. O'Hagan</u>, 521 U.S. 642, 656 (1997); 15 U.S.C. § 78ff(a). Thus, when the Government charges a defendant with conspiracy to commit securities fraud, it must show that the conspirators had the specific intent to exchange material, non-public information and to trade on that information.

It is no defense to the crime of conspiracy "that the ends of the conspiracy were from the very inception of the agreement objectively unattainable." <u>United States v. Hsu</u>, 155 F.3d 189, 203 (3d Cir. 1998) (quoting <u>United States v. Jannotti</u>, 673 F.2d 578, 591 (3d Cir. 1982) (en banc)).  Nor is it relevant that the underlying crime was legally impossible, so long as the conspirators intended to commit it.  <u>See</u> <u>United States v. Bosch</u>, 914 F.2d 1239, 1241 (9th Cir. 1990).  Here, Kevin Heron was an attorney who was responsible for ensuring Amkor's compliance with civil and criminal securities laws.  We must, therefore, assume

11

that he was familiar with the statutory and regulatory
limitations on insider trading and the relevant jurisprudence.
If Heron would have known that the acts contemplated by the
alleged agreement did not violate the securities laws, there
could have been no conspiracy because Heron could not have had
the specific intent to commit the underlying crime.

The crime of insider trading[9] is committed when a
corporate insider who has material, non-public information trades
on that information without first disclosing it.  Cady, Roberts,
40 S.E.C. at 911.  One who is neither an insider nor a fiduciary
has no duty to disclose information to the shareholders of the
corporation and so cannot commit a crime by failing to do so.
Chiarella v. United States, 445 U.S. 222, 229 (1980).  The duty
to disclose arises not from the mere possession of material, non-
public information, but from the fiduciary relationship to the
company or the shareholders.  Id. at 227.

The situation alleged in the conspiracy count here is
more complicated as it involves not trading by the individual who
acquires the information, but by another to whom he provides the
information, the so-called "tipper/tippee" scenario.  In that

---

[9] Insider trading is not, in fact, a separate crime,
but is a type of securities fraud.  See In re Cady, Roberts &
Co., 40 S.E.C. 907 (1961).  Nevertheless, we refer to it this way
to distinguish it from other varieties of securities fraud.

case, "a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material non-public information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." Dirks v. SEC, 463 U.S. 646, 660 (1983).  Unless "the insider personally will benefit, directly or indirectly, from his disclosure," there is no breach of fiduciary duty in the disclosure and, therefore, no derivative breach for the tippee.  Id. at 662.

     Although an indictment need only charge that the defendant satisfies each element of the offense, where an indictment describes the crime with greater specificity the Government must generally prove the crime described, not a generic violation of the statute.  See, e.g., United States v. Hoover, 467 F.3d 496, 502 (5th Cir. 2006) ("[W]hen the government chooses to specifically charge the manner in which the defendant's statement is false, the government should be required to prove that it is untruthful for that reason."); United States v. Baker, 227 F.3d 955, 961 (7th Cir. 2000) ("[I]f an indictment makes a fact or a manner of committing an offense material to that offense, that fact or manner must be proven, not a substantially different one.").  This requirement is intended both to allow a defendant to properly prepare the case for trial

and to scrupulously protect the defendant's Double Jeopardy
rights.

Here, the Government has charged that Heron and Sands
conspired to "exchange information regarding their respective
companies" and to use that information to make trades in the
securities of those companies.  To exchange, in this context, is
to "give and receive reciprocally." V Oxford English Dictionary
503, def. 2 (2d ed. 1989).  We are dealing with tipper/tippee
liability, so the exchange is a key element of the agreement
because it ensures that the tipper receives some benefit from his
action.  Without that benefit, there could be no insider trading
on these facts, so the bi-directional exchange of information
between Heron and Sands is an operative element of the offense
that the Government must prove.

Thus, in order for the Government to have proven the
indicted offense, it must have shown beyond a reasonable doubt
that Heron had the specific intent to both give to and receive
from Sands material, non-public information and that they reached
an agreement to exchange such information.  The Government must
also have shown that the information was exchanged with the
intent that the tippee would trade on it.  Since without a trade

14

there could be no insider trading, then without an intent to trade, there can be no conspiracy.[10]

Generally speaking, insiders are "officers, directors, or controlling stockholders."  Cady, Roberts, 40 S.E.C. at 911. Other people whose relationship to the company frequently requires them to be in possession of material, non-public information may also be insiders.  See Chiarella, 445 U.S. at 227 (limiting insider trading liability under Rule 10b-5 to situations involving "the existence of a relationship affording access to inside information intended to be available only for a corporate purpose.")  Here, however, no reasonable jury could find on the record before us that Sands was an insider.

"Mr. Sands was a part-time employee that was doing sales work primarily in the South American marketplace."  Tr. Day 3, at 65:21-23.  It appears that Sands "worked out of his home." Id. at 67:23.  The record reveals absolutely nothing about the source of his information, such as it was.  Certainly, there is no reason apparent or deducible from the record as to why Sands would have particular access for a corporate purpose to information involving corporate earnings and unannounced deals.

---

[10] The crime of securities fraud requires a trade.  See 15 U.S.C. § 78j(b) (requiring that fraud be "in connection with the purchase or sale of any security").  Thus, conspiracy to commit securities fraud must include an intention to trade.

Since the Government bears the burden of proving that Sands is an insider, it must produce <u>some</u> evidence to support such an inference.  Because it has produced none, we must find as a matter of law that Sands was not an insider.[11]  If Sands was not an insider, he cannot be a tipper and, consequently, Heron cannot be a tippee.  <u>See</u> <u>Dirks</u>, 463 U.S. at 660.

We next examine the evidence that Heron and Sands reached an agreement to commit an illegal act.  The Government's evidence of Heron and Sands's shared intention and agreement to commit securities fraud is twofold: the trades Heron and Sands made[12] and a series of e-mails they exchanged.[13]  The Government

---

[11] It is, of course, possible that Heron was aware of other facts that would make Sands an insider.  Because the record is silent on that question, however, to find that Heron believed Sands was an insider would require the jury to engage in the sort of unfounded speculation that is incompatible with the need to find Heron guilty beyond a reasonable doubt.

[12] In addition to Heron's trades in Amkor, about which we will have much to say later, the Government introduced evidence of two trades Sands made in Amkor: he sold 500 shares on April 15, 2004 and he sold 500 shares on June 4, 2004.  There is no record evidence of Sands purchasing Amkor securities, though the e-mails give the strong impression that he owned shares at some point.  The Government also introduced evidence that Heron sold 2,100 shares of Neoware on September 16, 2003.  He then purchased a total of 9,000 shares of Neoware between April 6, 2004 and May 10, 2004.

[13] Notably, although Sands had already pled guilty to a separate indictment, he did not testify at trial.

introduced twenty e-mails between Heron and Sands.[14]  These e-mails do not reveal any trades, intended or actually completed, that are not otherwise reflected in the record,[15] so any intent to trade in the securities of each other's companies must be inferred from conduct -- specifically, the trades themselves. The record includes only two trades that Sands made in Amkor: a sale on April 15, 2004 and a sale on June 4, 2004.  Neither of them is preceded by any negative information, material or otherwise, from Heron.  Indeed, although both of Sands's record transactions are sales, the record does not reflect that Heron ever communicated any negative information about Amkor to Sands. There is, therefore, no evidence in the record that Sands ever traded or intended to trade on information he received from Heron.  Without that evidence, Sands cannot have conspired to be a tippee.

Because as a matter of law on the record before us Sands could be neither a tipper nor a tippee, and because we must

_____

[14] These were Government exhibits 13, 22, 25-28, 31, 35, 40, 48-53, 56, 63, 69, 71, and 72.

[15] Government exhibit 56 does include Sands's statement that he has "made some acquisitions in nwre" (Neoware's ticker symbol).  For purposes of the conspiracy count, however, we are not concerned with Sands's trades in Neoware since those are not alleged to be -- nor could they sensibly be -- the object of the conspiracy charged here.

infer from his position that Heron was aware of the relevant securities laws, there can be no conspiracy.  Because Heron would have known that Sands was not an insider and because there is no evidence that Sands ever intended to trade on information he received from Heron, no jury could find that Heron intended to commit the crime of securities fraud in collaboration with Sands. Heron, in short, could never have had the specific intent to commit the crime in concert with Sands.  The Government's case was therefore inadequate to support the jury's finding and we must grant defendant's motion for a judgment of acquittal as to count I.

## C.   **Counts II-IV - Securities Fraud**

During the motion practice in limine, we were at great pains to ensure that, although it was clear from the record that Heron had violated company policy by trading during blackout periods, the Government could not use that fact to avoid its burden of establishing all the elements of a criminal violation of the securities laws.  See United States v. Heron, 2007 WL 2916196 (E.D. Pa. Oct. 5, 2007); United States v. Heron, Crim. A. No. 06-674, Order of September 26, 2007, (docket entry # 88).

Because it appeared from the record[16] that Heron had violated company policy and had traded in Amkor securities while simultaneously, in his role as Chief Compliance Officer, preventing other insiders from trading, we were particularly concerned that the jury not be allowed to conclude that his violations of company policy were tantamount to criminal acts. To prevent such an inequitable result, we have made -- and continue to make -- every effort to ensure that the Government has presented sufficient evidence to support each element of its securities fraud counts and is not relying on Heron's generalized bad acts or shady dealings for conviction.[17]

The indictment alleges insider trading based on Heron's trades during three periods in 2003 and 2004. As discussed above, in order to convict Heron the Government must have proven

---

[16] At the time of these Orders, we were reviewing the documentary record that the parties presented as attachments to their briefs.

[17] Now that the record is complete, it is clear that Heron took advantage of his position and sought to profit while preventing other insiders from trading. Compare, e.g., Gov't ex. 75 (April 28, 2004 e-mail from Heron determining that Win Churchill, a board member, cannot trade because he has material, non-public information) with Gov't ex. 106 (showing Heron's own trades on April 27, 2004 and April 30, 2004). While that conduct is dishonest and could justify disciplinary action by either Amkor or the Pennsylvania Bar, it is not a per se criminal act.

for each count that Heron was an insider,[18] that he was in possession of material, non-public information at the time of his trade, and that he willfully traded on the basis of that information.

1. **Count II – October, 2003**

The Government's allegations in Count II deal with a series of purchases Heron made in October of 2003. Between October 15 and October 17, Heron bought 4,000 shares of Amkor stock at an average cost of $16.5175 per share. Gov't ex. 103. On October 31, Heron sold ten options contracts, specifically January 15 calls,[19] at $510 each. Gov't ex. 106. On November 3, Heron sold ten more January 15 calls, again at $510 each. Id. Also on November 3, Heron sold 2,000 shares of Amkor stock at an

_____

[18] Heron never made any serious argument that he was not an insider. On the record before us, a jury could certainly have determined that he was an insider at all relevant times, so no further discussion of that issue is necessary.

[19] A call gives the purchaser the right to purchase the underlying stock from the seller at the specified strike price, here $15.00 per share, at any time before the third Friday of the expiration month, here January, 2004. Thus, by selling these calls, Heron gave the purchaser the right to acquire 1,000 of his Amkor shares at $15.00 per share at any time between October 31, 2003 and January 16, 2004. For purposes of analyzing Heron's trades, it makes sense to think of the sale of a call similarly to the sale of the underlying equity.

average price of $19.395.  Id.  The next day, he sold an
additional 1,000 shares at an average price of $19.5445.

        The Government identifies two potential material, non-
public facts that were available to Heron at the time of those
trades: information related to an SEC comment review and
information about Amkor's earnings for the quarter ended
September 30, 2003.  We discuss the SEC comment review first.

        At some time during 2003, ASI, a Korean company in
which Amkor had an interest, restated its earnings for the
previous three fiscal years because of a misinterpretation of
proper U.S. accounting principles in converting their financial
statements from Korean accounting principles.  Tr. Day 1, at
13:12-22; Gov't ex. 12.  The SEC sent Amkor a letter questioning
whether this restatement would have a material impact on Amkor's
past financial statements.  Tr. Day 1, at 13:12-17.  When it
received this letter from the SEC, Amkor did not inform the
public about the SEC's questions.  Tr. Day 2, at 14:5-14.

        On October 2, 2003, Amkor's Audit Committee met to
discuss the SEC comment review.  Gov't ex. 12.  Heron was present
at that meeting.  Id. at 2.  At the meeting, Amkor's accounting
firm, Pricewaterhouse Coopers, took the position that ASI's
restatement "would have no material impact on [Amkor]'s financial
statements."  Id. at 1.  As a result, the Audit Committee agreed

21

to a proposed response to the SEC, formally taking the position that Amkor did not need to restate its earnings.  Id.  The SEC, after it received Amkor's response, determined that no restatement was required.[20]  Tr. Day 2, at 14:15-20.  Amkor did not issue a press release about the SEC's review after it received word that no restatement would be necessary.  Id. at 14:21-15:5.

First, because the SEC's review itself had never been disclosed to the market, the SEC's determination that no restatement was required could not have been material.  Indeed, if it had been material, Amkor would have been obliged to report it on SEC Form 8-K.  See, e.g., SEC v. Gemstar-TV Guide Int'l, 367 F.3d 1087, 1098 (9th Cir. 2004).  If anything, the SEC's determination would merely have returned the situation to the status quo ante.[21]  The Chair of Amkor's Audit Committee, James

_____

[20] It is not clear from the record when exactly this happened in relation to Heron's trading.

[21] The Government could have argued that, during the pendency of the SEC's review, those who knew about the investigation were in possession of material, non-public information.  Such an argument, however, does not support the Government's case here.  If the pendency of the investigation were material information, it would clearly be negative.  The allegedly fraudulent transactions are buy-side transactions, indicative of Heron's positive view of the company.  Because the transactions are contrary to the information Heron would have possessed, he could not reasonably be found to have traded on the (...)

(continued...)

22

Zug, testified that the SEC's determination that no review was
necessary was not significant.  Tr. Day 2 at 35:3-7.  Investors
who were unaware of any possibility of a restatement could not
consider the news that no restatement was necessary to have
altered the total mix of information available to the market.[22]
If the SEC's final determination that no restatement would be
required was not material, Amkor's approval of its response to
the SEC, which was simply an argument that no restatement <u>should</u>
be required, also cannot have been material.  Thus, no rational
jury could have found that Heron possessed material, non-public
information or that he traded on the basis of that information.

Heron's e-mail to Sands of October 15, 2003 also fails
to demonstrate that the information is material.  <u>See</u> Gov't ex.
13.[23]  "[T]he fact that defendant ascribed significance" to the

---

[21](...continued)
basis of this information in making those transactions.

[22] Were it otherwise, newscasts would daily be filled
with reports of people who had not died unexpectedly.

[23] It appears that Heron is discussing the SEC
clearance as a possible explanation of Amkor's good performance
that morning when he says "word must be out!!!"  We note in
passing that this is strong evidence that Heron believed
information about the SEC review had been leaked.  If he believed
the information was public, even if that belief turned out to be
incorrect, he cannot have had the requisite intent to deceive.
Because we must make every reasonable inference in favor of the
Government, however, we will not decide the motion on this basis
(continued...)

SEC clearance, see Gov't Resp. at 13, does not make it material.
Because Heron knew the SEC review was underway, he is far more
likely to be interested in the clearance than a non-insider
investor.  Further, we cannot allow a determination that a
defendant traded on particular information to stand in as a
surrogate for the materiality inquiry.  Doing so would
effectively eviscerate any materiality requirement since
defendants must also trade on the information in order to face
liability.  If the very fact of a trade were dispositive evidence
of materiality, there would be no need for a separate materiality
inquiry.  Thus, even if Heron traded on the basis of the SEC
clearance, such a trade would not constitute securities fraud
because the information was not material.

The Government also argued that Heron had material,
non-public information about Amkor's positive results for the
quarter ended September 30, 2003.  On October 27, 2003, Amkor
announced very positive results for its third quarter, declaring
it "a landmark quarter."  Gov't ex. 17.  In response, Amkor's
stock rose nearly 20%.  Tr. Day 2, at 63:9-13.

---

[23](...continued)
since it requires an inference -- albeit an extremely reasonable
one -- as to the meaning of Heron's e-mail.

There is no direct evidence that Heron was aware of material details of third quarter financials at the time he made his trades.[24]  Rather, the Government relies on circumstantial evidence that it claims shows that Heron generally knew the quarter's results by the 15th of the next month.  In particular, Heron's direct supervisor, Ken Joyce, Amkor's CFO, testified that "somewhere around the 15th" of the next month, he would "probably" know the unaudited results.  Tr. Day 2 at 116:2-9.  The 15th of the following month was the time that Amkor would typically provide the quarterly results to their auditors for review.  Id. at 116:5-9.  Joyce never testified that at that point Heron would know the unaudited results.  Indeed, according to Joyce, Heron's involvement was primarily with the creation of the press release that would accompany the public announcement of the results and so Heron typically did not become involved until the press release was being written.  Id. at 116:13-117:11.  Neither Joyce nor anyone else testified that, as a matter of course, Heron would review the unaudited financial data before the process began of drafting the press release.[25]

---

[24] This is in contrast to counts III and IV where the Government introduced many e-mails that Heron received that contain the allegedly material information at issue.

[25] While a jury could reasonably infer that Heron could
(continued...)

Further, a look at the record evidence from later quarters creates a reasonable doubt that even Joyce himself would always[26] have had an accurate assessment of the quarter's financials by the afternoon of the 17th.[27]  At the end of the first quarter of 2004, Amkor was trying to decide whether it needed to pre-announce the likelihood that it would miss its guidance for the quarter.  It was not until the morning of April 16 that it became clear that no pre-announcement was necessary, see Gov't ex. 62, and it was not until the afternoon of the 19th that materials with detailed financials were ready for mailing to the Audit Committee, see Gov't ex. 65.  If not even Ken Joyce always had accurate financial data by the 17th of the month and

---

[25](...continued)
have accessed the financial data, there was no business reason for him to have reviewed it by the 17th.  It would, therefore, be naked speculation for the jury to conclude that he had actually obtained the information by then in the absence of any evidence specifically supporting that conclusion.

[26] In order for a jury to find guilt beyond a reasonable doubt on the basis of this evidence, it would need to be able to find that Heron routinely had material financial information by the 17th day of the month following the end of a quarter.  Such a finding on this evidence would be objectively unreasonable.

[27] Heron's last trade on the 17th was at 1:53:32 p.m. EDT.  Gov't ex. 103.  In 2003 and 2004, Joyce's office was in Chandler, Arizona.  Tr. Day 2, at 186:14-22.  Because Arizona is in the Mountain Time Zone, but doesn't observe Daylight Savings Time, that trade would have taken place at 10:53 a.m. local time in Chandler.

in the absence of any evidence tending to show that Heron had the information on this particular occasion, there is no basis for an inference that Heron had accurate data on the quarter's financials when he traded in October of 2003.

The Government, citing United States v. Henke, 222 F.3d 633 (9th Cir. 2000), urges us to find that Heron's trading patterns alone are sufficient evidence to support a finding of guilt beyond a reasonable doubt on count II. In Henke, however, there was no question about whether the defendant knew of the material, non-public information. See id. at 639 ("[T]he jury heard evidence that he sold a portion of his stock after learning of Cal Micro's false revenue reporting scheme and that his sudden decision to 'diversify' his portfolio came after receiving this information."). Thus, the trading pattern itself was evidence that the defendant traded on the material, non-public information, not that he possessed it. Indeed, our Court of Appeals has specifically held that suspiciously timed trades are not, by themselves, adequate evidence of securities fraud. See Burlington Coat Factory, 114 F.3d at 1424 ("[Insiders] will trade [company] securities in the normal course of events. We will not infer fraudulent intent from the mere fact that some officers sold stock.").

The fact that Heron profited at a time when it is possible that he had material, non-public information does not relieve the Government of its burden of proving that he actually possessed that information at the time of his trades.  Because there is no evidence from which a reasonable jury could conclude beyond a reasonable doubt that he had such information, we must grant defendant's motion as to count II.

## 2.  Count III - April, 2004

Count III addresses trades Heron made in April of 2004. The situation here is simpler.  The Government challenged a series of sell-side[28] transactions made throughout the course of the month.  In order to convict, however, the jury needed only to determine that a single transaction violated the securities laws. If such a determination was reasonable as to at least one transaction, we must uphold the jury's verdict.[29]

---

[28] By sell-side, we mean transactions that seek to reduce Heron's future exposure to Amkor equities by either reducing his holdings in the equity itself or taking option positions that allow him to effectively liquidate some of his holdings on previously agreed terms.  This can be accomplished, of course, not only by selling the equity, but also by selling calls or by purchasing puts.  Because all of these transactions reduce the investor's effective holdings, they are an appropriate reaction, inter alia, to a belief that the equity price will decline.

[29] At sentencing, it will be important to know exactly
(continued...)

On the evening of April 22, 2004, Kevin Heron received by e-mail the draft end-of-quarter press release and the complete financial presentation that was to be made to the Board of Directors.  Gov't exs. 66 & 67.  On April 23 and 26,[30] Heron sold a total of 3,000 shares of Amkor stock, purchased seventy puts, and sold thirty calls.  On the morning of April 27, Amkor issued the press release, which was largely identical to the draft Heron had seen on April 22.  See Gov't ex. 70.  Amkor's stock closed on that day down more than 31% from its close the previous day.  Tr. Day 2, at 66:12-20.

Those facts alone were sufficient for the jury to find that Heron committed securities fraud.  There is no reasonable argument that the draft earnings press release, which is identical in all important particulars to the press release that actually went out, is not material.  Although the information in it is not definite, it certainly alters the total mix of information available to an investor, and reasonable investors

_____

[29](...continued)
which transactions were fraudulent because the Sentencing Guidelines -- advisory though they may be -- take account of the amount of fraudulent gain.  Rather than attempt to resolve all those issues now, we invite the parties to submit further briefing focused on applying our rulings here to the proper calculation of Heron's Guidelines range.

[30] April 24 and 25 were a Saturday and Sunday, so the markets were closed.

would include such a draft -- particularly one so close in time to the actual release -- in their decisions about whether to buy or sell.  That the market reacted so dramatically when the press release was issued is further confirmation of the information's materiality.[31]  Although reasonable minds could differ about whether the Government proved that Heron traded on the press release,[32] it was not irrational for the jury to discredit Heron's claims of diversification and find that the earnings release motivated his trades.  The concentration of the trades in the small window between Heron's acquisition of the material, non-public information and its public release, as well as the sudden increase in options trading, both permit an inference that Heron's trading was done on the basis of the material, non-public

---

[31] It cannot be the case that materiality can only be measured at the time of public release.  If that were proper, pre-release information could never be material and there could be no such thing as information that was both material and non-public.  If any pre-release information could ever be material, it would be a draft press release whose subsequent publication, without significant delay or alteration, causes such a strong reaction in the market.

[32] Heron argued that he was engaged in a diversification strategy that happened to coincide with a period of poor performance for Amkor.  First, we cannot consider that argument because the only evidentiary support for it was produced in Heron's own case, after the Rule 29 motion.  Second, the jury was certainly free to disbelieve that account of the reason behind Heron's trading and conclude instead that the material, non-public information was a powerful motivator for his trades.

information.  Finally, the jury could infer that Heron, who was well aware that trades such as these violated the securities laws, acted with the intent to deceive.

Thus, we must deny Heron's motion with respect to count III.

### 3.  Count IV - May-July, 2004

Count IV presents the issues of materiality, motivation, and intent most pointedly.  In evaluating Heron's motion with regard to this count, we must examine three significant issues: (1) could a reasonable jury have found, on the evidence presented, that Heron possessed material, non-public information when he traded; (2) could a reasonable jury have found that he traded on the basis of that information; and (3) could a reasonable jury have found that Heron did so with the requisite intent to deceive.  Before we begin that examination, we review briefly the relevant charged conduct in count IV.[33]

Between May 20 and June 23, 2004, Kevin Heron sold a total of 17,000 shares of Amkor stock.  During that same period, he sold seventy calls and bought 200 puts.  At that time, Amkor

---

[33] As we noted above, the jury's verdict must stand if there is at least one transaction that meets these criteria.  The Government need not prove that all the charged transactions were fraudulent.

senior management was concerned with two major issues: (1)
results for the second quarter of 2004 that would be
significantly below the guidance Amkor had previously announced,
and (2) the final stages of negotiating a deal to acquire
Unitive, a privately-held semiconductor company.  Before the
markets opened on July 1, 2004,[34] Amkor announced that earnings
per share and gross margins for the second quarter would both be
significantly below the guidance the company had previously set.
Gov't ex. 100.  The stock dropped 29.2% that day.  Gov't ex. 103.
Although the Unitive transaction had been in negotiations for a
number of months, <u>see</u> Tr. Day 2, at 29:20-30:9, it was not
announced until the morning of July 21, 2004.  Gov't ex. 101.
That day, the stock fell 9.68%.  Gov't ex. 103.

### a.  <u>Materiality</u>

In examining materiality, courts must balance
investors' desire for information with the unavoidable reality
that corporate insiders will always have greater access to
information than outside investors.  As an example, Ken Joyce
testified that the financial group essentially produced the
financial statements for a quarterly report every month.  Tr. Day

---

[34] The final decision to pre-announce was made on June
30, 2004.  <u>See</u> Gov't ex. 99.

32

2, at 113:23-114:6.  Thus, at any given time, Joyce has financial information that is between one and three months more current than the information the public has.  Were we to hold that all of this information is material, the result would be that Joyce could never safely trade in Amkor securities because he would always have material, non-public information.  Not only is such a result undesirable, our Court of Appeals has made clear that because many executives are compensated at least partially in company stock, such a result would hold them to an unreasonable standard and would be an improper reading of the law.  See Burlington Coat Factory, 114 F.3d at 1424.

Further complicating matters in this case is that Heron was, as Chief Compliance Officer, responsible for making certain materiality determinations for the company.  Among his job duties was to help determine when Amkor was required to make public disclosures, see Gov't ex. 96, and to notify insiders when they were allowed to trade, see Tr. Day 3, at 60:1-61:16.  Although Heron made these determinations by interpreting the same statutes, regulations, and jurisprudence that we examine here, his determinations were not dispositive for at least two reasons. First, because "[i]t is emphatically the province and duty of the judicial department to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), the courts have not and cannot

33

cede their responsibility for making these determinations to the executives of private sector corporations.  Second, and perhaps more importantly, Heron is interpreting the law for the purpose of protecting Amkor and its officers and directors from civil lawsuits and potential civil and criminal liability.  As such, he has every interest in interpreting the law conservatively and erring on the side of disclosure and restricted trading.  Thus, the finder of fact cannot presume that, if Heron deemed something material for purposes of determining whether to disclose or trade, it must also have been material for purposes of subjecting Heron to criminal sanctions.[35]  Though Heron's decision to trade, while simultaneously barring others with the same information from doing so, offends our sense of fair play and honest dealing, it does not in any way alter our calculus with respect to whether his actions criminally violated the securities laws.

     With those caveats, and recalling our discussion of materiality above, we look at the particular evidence of material, non-public information here.  As of May 18, 2004, the Unitive transaction was still under negotiation and Heron was unaware of when it was scheduled to be announced.  See Gov't ex. 82.  Aside from the existence of negotiations, there is no

---

[35] Heron's determinations are, of course, relevant to issues regarding his scienter.

evidence in the record from which the jury could have found that the transaction was material at that point.[36]  James Zug, who himself traded on May 19, also believed the information was not yet material.  <u>See</u> Tr. Day 2, at 29:23-25.  Since Heron was required to preclear Zug's trade, he must also have believed the transaction was not yet material.  <u>See</u> <u>id.</u> 117:22-119:3.

By June 3, Amkor had put a trading restriction in place[37] because of concerns that certain insiders might have material, non-public information about the Unitive deal.  <u>See</u> Gov't ex. 89.  The trial record does not reveal what had changed between May 19 and June 3 that warranted the imposition of a trading restriction.[38]  Indeed, the only record evidence that <u>any</u>

---

[36] If, for example, the Government had introduced financial projections for the Unitive deal that Heron had prior to that date, the jury would have been able to evaluate those projections under the materiality standard.  Because the Government introduced no such evidence, there is no factual basis for a finding of materiality.

[37] We know from the pre-trial motions that this trading restriction began on May 24, <u>see</u> <u>Heron</u>, 2007 WL 2916196 at *4, but there is no evidence in the trial record that reflects this.

[38] It is, of course, not unusual that a deal would not be material for purposes of securities fraud at one point in time but would become material later.  Because definiteness is relevant to materiality, as the deal's ultimate conclusion becomes more likely, and as information about it becomes more detailed, there is more reason to find that information about the deal is material.  A jury's determination of exactly when that happens, however, must be supported by the evidence.  The jury
(continued...)

Amkor insider had material, non-public information about the Unitive deal on June 3, 2004 is the existence of the trading restriction.  We held repeatedly in pre-trial motion practice that the existence of a trading restriction was not, by itself, sufficient evidence that Heron or anyone else actually had material, non-public information.  Heron, 2007 WL 2916196 at *2. Because that trading restriction is the only evidence in the record of the Unitive transaction's materiality prior to the afternoon of June 10, our earlier ruling compels a finding that the deal was not material prior to that date.

On June 10, 2004, Kevin Heron received an e-mail from Ken Joyce containing materials for a teleconference with the Board of Directors at which the Unitive deal was to be discussed. Gov't ex. 93.  That presentation included detailed financial projections related to the deal.  As Joyce summarized, the deal would "compress[] gross margins in both 2004 and 2005 but [would] significantly benefit future years."  Id.  Although the deal was still indefinite at this point, a jury could certainly conclude

---

[38](...continued)
cannot simply assume that the deal grew more definite at a steady, linear pace throughout the negotiation period.  Because there is no evidence in the record that explains how or when the deal became more definite during this period, a finder of fact cannot determine when or if it became material before June 10, 2004.

that this information was material.  This report is, in fact, significantly more detailed than the press release that Amkor issued once a definitive agreement was signed.  Thus, for purposes of our analysis, we find that the jury could reasonably have concluded that after the afternoon of June 10, 2004, Heron had material, non-public information about the Unitive deal.

The Government also argues that Heron had material, non-public information related to Amkor's eventual decision to pre-announce its failure to meet earnings targets for the second quarter.  In the same June 10 e-mail from Ken Joyce that included projections regarding the Unitive transaction, Joyce raised the possibility that Amkor would miss its guidance for the second quarter.  Gov't ex. 93.  That concern was discussed at the board meeting the next day, see Gov't ex. 94, but the board apparently decided that further study was necessary.  Indeed, four days later, Joyce said, "I am confident we have made the right decision to delay any announcements until we have a better view of the Q2 forecast."  Gov't ex. 97.  The company's management team went back and forth on the question of whether a pre-announcement was necessary until June 30, when it finally decided to pre-announce.  See Gov't ex. 99.  On July 1, Amkor issued its pre-announcement.  As we have noted above, the market did not take this development well.

37

As of June 10, Amkor did not consider the early stage financial projections sufficiently reliable to act on them.  If Amkor had information that made prior disclosures misleading, it would have been obliged to disclose that information.  See SEC Form 8-K.  At the board meeting, Amkor came to the conclusion that the information it had was not sufficiently definite to warrant disclosure.  If they were correct, the information was immaterial as a matter of law.[39]  As the Government introduced no evidence that would allow the jury to assess the reliability of the projections as they existed on June 10 and 11, there is no basis for determining that Amkor's management team was mistaken in this conclusion.[40]

We conclude, therefore, that a reasonable jury could find that Heron was in possession of material, non-public information from the afternoon of June 10, 2004 until July 21, 2004 when the Unitive transaction was announced.

---

[39] Indeed, even if their determination was incorrect as a matter of law, so long as Kevin Heron reasonably and in good faith believed it was proper, that would defeat scienter.

[40] We note further that, because we have already determined that the Unitive transaction was material after June 10, 2004, the potential pre-announcement need not be material to support the jury's verdict with regard to transactions after that date.  There is no evidence that Heron was aware of the second quarter pre-announcement issue before June 10.

**b. <u>Motivation</u>**

Having determined that a reasonable jury could have found that Heron had material, non-public information after June 11, 2004, the next question is whether the jury could have found that his trades were based on that information.  Exactly how to interpret that element of an insider trading violation has been the subject of much dialogue between the courts and the SEC.

The Supreme Court has repeatedly included an element requiring trading "on the basis of" the material, non-public information in order to make out securities fraud.  <u>See, e.g.</u>, <u>O'Hagan</u>, 521 U.S. at 651-52 ("Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation <u>on the basis of</u> material, non-public information.") (emphasis added).  In pre-trial submissions, the Government urged us to instruct the jury that a trade was on the basis of material, non-public information if that information was "a factor, however small, in the insider's decision to buy or sell."  Gov't Prop. Jury Insts. (docket entry # 100) at 49.  By contrast, Heron urged us to charge the jury that "the information must have been a significant factor in the defendant's decision to buy or sell securities."  Def. Prop. Jury Insts. (docket entry # 106) at 24.  We adopted the latter

approach, finding that the Government's proffered instruction would effectively render the "on the basis of" requirement a nullity.[41]  We read the Supreme Court's statements to require an inquiry into the defendant's motivation for making particular trades <u>and</u> a determination beyond a reasonable doubt that those trades were caused, at least in significant part, by the inside information.

Because a finding that trades were made on the basis of particular information requires the jury to get inside the mind of the defendant, the Government will nearly always be forced to prove this element by circumstantial evidence.  Generally speaking, the trades themselves will represent the most significant evidence in this regard.[42]  When an insider who is in

---

[41] Indeed, the SEC has gone so far as to issue a rule that an investor trades on the basis of material, non-public information so long as he or she is aware of the information at the time of the sale.  17 C.F.R. § 240.10b5-1(b).  The rule offers an affirmative defense when the investor had adopted some binding plan to trade prior to learning of the information.  Whatever the potential value of this rule in civil cases, it should be clear that its use is inappropriate in criminal cases.  The rule takes an element of the crime, presumes it against the defendant, and effectively converts it to an affirmative defense.  This sort of shifting of the burden of proof is at war with settled notions of Due Process in criminal cases.  <u>See</u> <u>In re Winship</u>, 397 U.S. 358, 363-64 (1970).

[42] Obviously, where there is other evidence probative of an investor's motivation to trade, the trades themselves will become less important.  Here, the jury was asked to infer Heron's
(continued...)

possession of material, non-public information appears over time to have an uncanny ability to predict the vicissitudes of the market, the jury may permissibly infer that the information is a factor in the trades.  "The larger and more profitable the trades, and the closer in time the trader's exposure to the [inside information], the stronger the inference that the trader was acting on the basis of inside information."  SEC v. Ginsburg, 362 F.3d 1292, 1299 (11th Cir. 2004).

Such an inquiry, however, must be undertaken in the context of the investor's overall trading pattern.  Where the trading after the acquisition of material, non-public information does not differ significantly from the trading beforehand, that reality will tend to rebut the inference of trading on the basis of the information.  Similarly, if an investor makes trades that are inconsistent with the material, non-public information, then that will also weigh against a finding that other trading

---

[42](...continued)
motivation exclusively from the trades themselves, so we must examine the trades closely.

consistent[43] with material, non-public information was on the
basis of such information.

Heron's trades on June 10, 2004 all take place before
his receipt of Ken Joyce's e-mail, so his first trades while
potentially in possession of material, non-public information are
on June 15 and 16.  On those two days, he sold a total of 2,100
shares.  If anything, this represents a moderation of his pattern
of selling.  In the previous three weeks, Heron had sold 10,000
shares and engaged in sell-side options trades covering 22,000
more shares.[44]  Heron's sales on June 15 and 16 are quite modest
by comparison.

The following week, Heron sold an additional 4,000
shares, but he also sold twenty puts.[45]  If, as the Government

_____

[43] This distinction implies a requirement that it be
clear whether the information is positive or negative.  If the
information is equivocal, it will be very difficult for the
Government to prove that it is a factor in the defendant's
trading.  Here, it is permissible for the jury to conclude that
all the available non-public information was negative.

[44] Each option contract covers one hundred shares.  In
the three weeks between May 24 and June 11, Heron sold seventy
calls and bought 150 puts.  As we discussed above, both the sale
of calls and the purchase of puts reduce his portfolio's exposure
to the changing price of Amkor and so should generally be treated
as similar to sales.

[45] The summary that the Government prepared for the
jury, Gov't ex. 103, excludes this transaction.  We will give the
Government the benefit of the doubt and assume that this was
(continued...)

42

argues, Heron <u>knew</u> that Amkor was going to pre-announce in a few days, this trade was simply money thrown out the window.  The twenty puts that Heron owned[46] each gave him the right to sell one hundred Amkor shares at a guaranteed price of $7.50 at any time before September, 2004.  On June 23, Amkor traded at $8.77.  A week later, after the pre-announcement, Amkor was trading at $5.79.  Heron's decision to sell these puts is inconsistent with the allegation that he was trading on material, non-public information.[47]

Heron then executed no trades for two weeks.

Taken in context, Heron's trading for the four weeks between June 11 and July 9 -- a period when the jury could

---

[45](...continued) simply an innocent mistake, but it is distressing that the only transaction from the relevant periods that appears to be missing from the summary is the one that is contrary to the general trading pattern that the Government argued Heron was engaging in.  Though no challenge was made, summaries must be accurate and non-prejudicial to be admissible.  <u>Pritchard v. Liggett & Meyers Tobacco</u>, 295 F.2d 292, 301 (3d Cir. 1961); <u>Daniel v. Ben E. Keith Co.</u>, 97 F.3d 1329, 1335 (10th Cir. 1996).

[46] Heron had purchased these puts on June 7, 2004.

[47] We do not by any means suggest that a single inconsistent transaction is an absolute defense to a charge of insider trading.  Where, however, the evidence that the trades were on the basis of the information is not overwhelming, the existence of one or more inconsistent transactions is an important factor for the jury to consider.  That is especially so in this case where the fact of the trade was in the record, but was hidden from the jury by its omission from exhibit 103.

reasonably have found that he had negative material, non-public information -- is far less bearish than his trading in the previous three weeks.

Heron's next trades were on July 14 and 15.  On those two days, he sold sixty puts and bought 500 shares.  Because the material, non-public information Heron allegedly held at that point was negative, these buy-side transactions are inconsistent with an inference that he was trading on the basis of bearish information.

Taken as a whole, therefore, Heron's trading does not support an inference beyond a reasonable doubt that his trades were caused in significant part by the material, non-public information he held.  Even taken in the light most favorable to the Government, these trades are indicative only of a moderately bearish view of the stock and provide no basis for a determination beyond a reasonable doubt that those bearish views were caused by the material, non-public information the Government alleges Heron had.  This conclusion is fortified when one compares this trading with the more aggressively bearish position Heron had taken before he acquired the information.

### c. **Intent**

The Government must also show that Heron made his trades with the intent to deceive.  Although, because Heron is intimately acquainted with the securities laws, this element largely overlaps with the previous two, it adds one important factor.  A reasonable, good faith belief that the information is immaterial or public is a defense to criminal conviction securities fraud.  See United States v. Gross, 961 F.2d 1097, 1102 (3d Cir. 1992).  If Heron can show that he held such a belief, he must be acquitted.

On count IV, there is no evidence that compels a finding that Heron acted in good faith.  Although Heron could -- and did -- argue that he reasonably believed certain information was public or not material, the jury found that, with regard to information that was in fact material and non-public, any trades Heron made on the basis of that information were made with the intent to deceive.  Nothing in the record suggests that we should disturb that determination.

Because we find that -- during the time when a jury could reasonably have found that Heron had material, non-public information -- the Government has, as a matter of law, failed to demonstrate that he traded on the basis of that information, we will grant Heron's motion as to count IV.

45

## IV.  **Heron's Motion for a New Trial**

Heron also moves, in the alternative, for a new trial under Fed. R. Crim. P. 33(a).  Because there is no claim of newly discovered evidence, such a motion must be filed within seven days of the verdict.  Fed. R. Crim. P. 33(b)(2).

Heron made his motion for a judgment of acquittal at the close of the Government's case-in-chief.  Tr. Day 3, at 139:11-13.  As noted, we reserved decision on that motion under Rule 29(b).  Id. at 192:5-21.  Heron did not renew his motion at the close of the defense, see Tr. Day 4, at 180, and made no oral motion under Rule 33.  The first mention of a motion under Rule 33 is in Heron's brief in support of his Rule 29 motion, which was not filed until November 14, nearly a month after the jury's October 19 verdict.  On its face, then, the motion is untimely.

Heron's counsel argues that he interpreted our briefing schedule for the Rule 29 motion to grant an extension on all post-trial motions.  While we could have granted such an extension, we see no interpretation of our rulings from the bench or in our written orders in this case that would allow counsel reasonably to infer that we did so.  Neither do we find convincing counsel's argument that we should consider the motion on the basis of excusable neglect.  On this record and with such experienced counsel, we can only conclude that counsel made the

46

decision for strategic reasons not to make a Rule 33 motion at the conclusion of the trial.  Even if counsel has now changed his mind about that decision, that does not allow us to suspend the Rules of Criminal Procedure.

Heron's motion for a new trial, therefore, must be denied as untimely.

## V.  **Plain Error**

Although we deny Heron's motion for a new trial as untimely, if the trial was infected by plain error that likely resulted in the denial of a substantial right, we may consider it under Fed. R. Crim. P. 52(b) even in the absence of a motion or objection.[48]

A finding of plain error is proper only where "(1) an error was committed; (2) the error was plain; and (3) the error affected [defendant]'s substantial rights."  United States v. Stevens, 223 F.3d 239, 242 (3d Cir. 2000) (citing United States v. Olano, 507 U.S. 725, 732-34 (1993)).  Generally speaking, a

---

[48] Although plain error analysis is usually the province of the Court of Appeals, the Rule -- which is contained in the Federal Rules of Criminal Procedure, not the Federal Rules of Appellate Procedure -- is not limited to appellate practice. Where, as here, the case arrives in a fitting procedural posture, district courts have on occasion undertaken plain error analysis themselves.  See, e.g., United States v. Harper, 2007 WL 3103240 (Oct. 23 2007) at *11 (Padova, J.); United States v. Zomber, 358 F. Supp. 2d 442, 455 (E.D. Pa. 2005) (Rufe, J.).

error will be found to affect substantial rights only where the error was "prejudicial" and "affected the outcome of the district court proceedings." Olano, 507 U.S. at 734. We should exercise our discretion to correct plain error only where the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 732 (internal quotation omitted).

There are a number of aspects of the conduct of this trial that we find deeply troubling. Chief among them is that the Assistant United States Attorney repeatedly misstated the standard for materiality of non-public information during his closing argument.[49] An appalling seventeen times in a little over an hour, the prosecutor said that the determining factor for materiality was whether a reasonable investor "would want to know" the information. Tr. Day 5, at 5:9-10, 6:3, 11:4-5, 11:25-12:1, 20:20-22, 23:24-25, 24:3-4, 24:10-12, 24:14-16, 29:13-18, 30:8-9, 31:7-9, 31:21-22, 39:21-25, 42:19-21, 44:25-45:2, 46:15-18. Indeed, the Government continues to use that standard in its briefing, see Gov't Resp. at 8 ("There is no question that a jury

---

[49] Here, because we act sua sponte rather than in respect to an oral motion, we are not limited to the record as it existed at the time of Heron's motion.

could rationally find that a reasonable investor would want to
know about the largest deal in the company's history.").

The Government's "want to know" standard requires no
finding that our hypothetical reasonable investor would actually
consider the information in deciding whether to invest, a
requirement the Supreme Court was at pains to include in its
definition of materiality.   See TSC Indus., 426 U.S. at 449.
The Government's standard would foreclose all trading by insiders
(or even employees) of public companies, the vast majority of
whom are always in possession of information that investors
"would want to know."  Under that expansive standard, information
as trivial and potentially invasive as the health of the CEO's
marriage would become material since reasonable investors might
"want to know" if he or she is so distracted.

There can be no doubt that such a blatant and repeated
misstatement of the applicable law is error and plain in that it
"seriously affect[s] the fairness, integrity or public reputation
of judicial proceedings."  The chant this prosecutor used was no
slip of the tongue, but a deliberate attempt to get the jury to
apply a reading of the law far more favorable to the Government
than that in our jury instructions.

Our instruction to the jury did, of course, state the
proper standard, but where an improper standard has been stated

49

so many times and where neither defense counsel nor the Court called specific attention to the prosecutor's misstatement, we must be vigilant to be sure that this misconduct did not deprive Heron of his Fifth Amendment due process rights.

The Government made other improper assertions in its closing as well.[50]  The assertion that, because Heron was "in the loop," he knew everything that was going on, see, e.g., Tr. Day 5, at 5-7, invited the jury to infer that Heron possessed material, non-public information even at times when there was no evidence that he did.  As we have discussed, the jurisprudence is clear that a finder of fact cannot assume that certain insiders always possess material, non-public information.  While this assertion, by itself, would not create the risk of prejudice, it deepens any prejudice caused by the Government's incantation that liberalized the materiality standard.  The Government in essence invited the jury to find that a crime had been committed any time Heron made money trading Amkor stock.

The Government's argument that "[p]eople lie because they are guilty," Tr. Day 5, at 53:13, again asks the jury to find Heron guilty without considering the elements of the crimes

---

[50] These assertions are discussed at length in Heron's motion for a new trial.  Although we have concluded that his motion is untimely, we can and do consider his arguments in the context of our plain error analysis.

charged in the indictment.  Indeed, while Heron's false

statements to Ms. Rock (such as they were[51]) might potentially be

probative of scienter, he was not charged with making false

statements.  The Government attempted to turn a tiny detail of

its investigation into a basis for guilt, ignoring the clear

purpose of Fed. R. Evid. 404, which excludes this sort of

character-assassinating evidence.

        Finally, the prosecutor's decision to resort to name-

calling in his closing argument is at best unprofessional and at

worst prejudicial to the administration of justice.  During his

closing, the Assistant United States Attorney referred to Heron

as "a common thief," Tr. Day 5, at 25:15, and to Dr. Wu, Heron's

expert, as a "hack," Tr. Day 5, at 45:17, 48:15.  "The United

States Attorney is the representative not of an ordinary party to

a controversy, but of a sovereignty whose obligation to govern

impartially is as compelling as its obligation to govern at all;

and whose interest, therefore, in a criminal prosecution is not

---

[51] The Government argued that, when Heron told Ms. Rock
he had not traded, he meant that he had never traded in Amkor
stock.  That an attorney whose trades in Amkor during a one year
period span five pages in the record would intentionally tell an
agent of the SEC that he had <u>never</u> traded in Amkor securities
strains credulity.  Nevertheless, it is clear that he made
incorrect statements to the SEC and the jury was free to
interpret those misstatements as intentional or inadvertent as it
saw fit.

that it shall win a case, but that justice shall be done."
Berger v. United States, 295 U.S. 78, 88 (1935).  The only reason
to resort to the kind of tactics the prosecutor employed here is
to try to talk the jury into a conviction despite weak evidence.
Such conduct has no place in the courtroom and ignores that it is
as much the duty of the U.S. Attorney "to refrain from improper
methods calculated to produce a wrongful conviction as it is to
use every legitimate means to bring about a just one."  Id.

      "[I]n order to show that a misstatement of law affects
the substantial rights of a defendant, the defendant must
demonstrate that the error was prejudicial."  United States v.
Casteneda, 241 Fed. Appx. 411, 413 (9th Cir. 2007) (citing Sims
v. Brown, 425 F.3d 560, 579 (9th Cir. 2005)).  On this record, we
have ample evidence that the prosecutor's misstatements of the
law resulted in prejudice.  We have already found that the jury
convicted Heron on the basis of information that was immaterial.
In count I, for example, we found that there could have been no
agreement to exchange material, non-public information in part
because the information at issue was not material.  In count II,
we found that the SEC's decision not to review Amkor's financials
was immaterial as a matter of law.  Similarly, in count IV, we
found that the information Heron had in his possession during
much of the charged trading was, as a matter of law, not

material.  That the jury convicted Heron on all three of these counts is, by itself, strong evidence that it was not applying the correct materiality standard and was instead applying the looser standard that the prosecutor offered seventeen times in his closing.  When we also consider the other disturbing aspects of the prosecutor's closing argument, we have no difficulty in concluding that, at least on these three counts, the Government's actions were prejudicial and deprived Heron of due process.

With regard to count III, we find that, even had the jury applied the correct materiality standard, it would very likely have concluded that the information Heron had regarding the end-of-quarter press release was material.  Because it is likely that the jury would have convicted in any case, and because we review these issues under plain error in the absence of a timely objection, any error that may have resulted from improper statements in the closing argument was harmless with regard to count III.

We find that the existence of plain error has prejudiced Heron's substantial rights in regard to counts I, II, and IV.  We will, therefore, conditionally grant a new trial under Fed. R. Crim. P. 29(d) in the event that our judgment of acquittal as to those counts is vacated or reversed.

BY THE COURT:


/s/ Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA         :        CRIMINAL ACTION
                                 :
        v.                       :
                                 :
KEVIN HERON                      :        NO. 06-674-01

<u>ORDER</u>

        AND NOW, this 19th day of December, 2007, upon
consideration of Kevin Heron's motion for judgment of acquittal
or in the alternative for a new trial (docket entry # 128), the
parties' briefs thereon, the Government's motion to dismiss
defendant's motion for a new trial (docket entry # 129), Heron's
motion for leave to file a sur-reply (docket entry # 133) and for
the reasons articulated in the accompanying Memorandum of Law, it
is hereby ORDERED that:

        1.      Heron's motion for leave to file a sur-reply is
GRANTED;

        2.      Heron's motion for judgment of acquittal is
GRANTED IN PART;

        3.      As to Counts 1, 2, and 4 of the Second Superseding
Indictment, the jury's verdict is VACATED and defendant Kevin
Heron is ACQUITTED;

        4.      Heron's motion for a new trial is DENIED as
untimely;

        5.      The Government's motion to dismiss Heron's motion
for a new trial is DENIED AS MOOT;

        6.      As to Counts 1, 2, and 4 of the Second Superseding
Indictment, a new trial is CONDITIONALLY ORDERED in accordance
with Fed. R. Crim. P. 29(d)(1) subject to any subsequent action
by the Court of Appeals; and

        7.      With respect to the briefing referenced in note 29
of the accompanying Memorandum, the parties shall FILE the
described briefing by January 15, 2008.

                                 BY THE COURT:

                                 /s/ Stewart Dalzell, J.